K17-1799, United States of America v. Tyrone Christian, arguing on 15-15 minutes per side. The legalizing attorney is Lucille Jewell. Good morning, your honors. May it please the court. I'm Lucille Jewell. I'm from the University of Tennessee Appellate Litigation Clinic, and it is my honor to introduce the court to the two student attorneys who will be arguing the case today, Daniel Burley and Grant Mitchell. We have filed a motion for student participation, which this court has granted. We've also filed a motion to divide the argument time. So Mr. Burley will be arguing for seven minutes, Mr. Mitchell will be arguing for six minutes, and two minutes for rebuttal. Thank you very much. Thank you. You're Mr. Burley? Yes, your honor. Please proceed. May it please the court. My name is Danny Burley, and with my co-counsel, Grant Mitchell, we represent the defendant, Tyrone Dexter Christian, in this case. This case is about the illegal search of Mr. Christian's home based on a deficient affidavit that did not establish the requisite direct, reliable connection, the nexus, between Mr. Christian's home and the illegal activity of another man, Reuben Thomas, listed in the affidavit. The Supreme Court has stated that the very core of the Fourth Amendment is the right of a person to retreat into their own home and there be free from unreasonable government intrusion. It is highly unreasonable to have your home searched after another person seen merely in the area of your home is used as the only reliable evidence to establish probable cause to forcefully enter and search your home. In the United States v. Brown, this court distilled its line of cases and held that if an affidavit fails to include facts that directly connect the residence with suspected drug dealing activity or the evidence of the connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home, even if the defendant is a known drug dealer. There was a controlled by eight months before at the house, right? Correct, Your Honor, there was. Oh, that's direct evidence of drug dealing eight months before. Why is that not sufficient? Your Honor, that is not sufficient because that evidence is stale. That evidence would only hold up as probable cause to search the home for drugs. And because this court has held many times over that evidence of drugs goes stale very quickly, that eight months ago a stale drug buy cannot be enough to establish nexus, to establish probable cause in this case. What about the affidavit's reference of numerous subjects saying that within the last four to five months there had been drug dealing? Correct, Your Honor. Four or five months ago, within the last four or five months, subjects did state these things. However, this court has held in the absence of any indicia of reliability of statements by informants, these are only subjects, but informants, there must be substantial independent police corroboration that occurs after that fact. And the only fact that we have post those statements is the illegal activity of Reuben Thomas seen in the area of the home. In the district court, when looking at that paragraph, the district court even said that in the area doesn't mean at the home, it could mean next door, maybe 100 feet away is what the district court judge said. Doesn't the affidavit later say that Thomas denied being at the residence contrary to the observations of the law enforcement officers? It does say that, Your Honor. So why shouldn't we give deference to the magistrate's interpretation of that being at the residence? Denying being at the residence is contrary to the observations. That means he was at the residence. I mean, you have to make a negative inference, but it seems to be a pretty direct one. And, Your Honor, we look to the standard review here in reviewing findings of fact. The district court found in that paragraph that those statements... I'm not talking about the district court, I'm talking about the magistrate. We give deference to the magistrate, don't we? Correct, Your Honor. Here it looks like a magistrate could interpret those words as meaning he was at the residence. And if he was at the residence, then you lose on this issue, right? Your Honor... If they had seen him at the residence, there's really not much to your argument, is that correct? Your Honor, which we don't concede, but if they did see him at the residence, it's still the observations of another man seen at the home. And the court's case is... Oh, he's another man seen at the home, and then they went and tracked him down, and he had contraband that he'd gotten recently, right? Your Honor, we don't know when he got the contraband. The government's brief states a lot of facts that are nowhere listed in the affidavit between this association between Mr. Christian and Mr. Thomas. And that paragraph doesn't associate Mr. Christian to buying drugs from Mr. Thomas. It simply states that he had drugs on his person, found some, I believe it was 12 miles later, found some time later, and they had them in his car. The most recent place he'd been was this, depending on how you read this sort of negative inference, was at the home, right? Correct, Your Honor. I mean, probable cause doesn't mean you're sure. It just means it's probable. Wouldn't any reasonable person say that it was probable that there were drugs there? No, Your Honor, because simply, again, a negative inference cannot mean that... Well, it's a negative, I guess you could, I call it a negative inference, but I mean it's not really a negative inference, it's just an inference. It states he denied something contrary to the observation of the law enforcement officers. That suggests to me that the law enforcement officers saw something contrary, which was that he was at the residence, right? Negative of a negative is an affirmative, right? Correct, Your Honor. And on inferences relating to drug trafficking, in footnote 2 in Brown, this court held that inferences in cases that deal with overwhelming evidence that these individuals that are subjects of arrest, such as Mr. Christian here, are major players in large, ongoing drug trafficking operations. The evidence here does not describe Mr. Christian as a major player in a large drug trafficking operation. But as to this one, all you really need is this one, right? If the judge could reasonably infer that this person obtained drugs hours before at that residence, that would be enough probable cause for a search, wouldn't it? If the judge could reasonably infer, but we assert that this paragraph does not state that. Right, but if we disagree with you on that, then all this other stuff we don't really need, right? No, Your Honor, because the other stuff... Takes away from that?  is the stale evidence that in regards to a drug buy that doesn't exist of any quantity, of any type, it doesn't state anything. And later on, we are supposed to assume that Taron Dexter Christian in 618 Granville Avenue is a large-scale, major player in a heroin drug trafficking operation. Is the state's argument saved by the fact that the warrant requests documents first, as opposed to seeking drugs? No, Your Honor, the state's argument is not saved. Because when we are looking at a staleness argument in regards to the records, we must look at what could have established probable cause at some time in the past. And again, the only thing that could have possibly established that nexus is 8 months ago, a stale drug buy, a single drug buy, that did not have the quantity, the type, or how it was corroborated. And in Hython, this court said that we must look at the number of controlled buys in combination with comings and goings of the house. We have one single drug buy, and I see my time is finished, Your Honors. May I briefly conclude? I think we have your argument.  Mr. Mitchell. May it please the court. My name is Grant Mitchell, and I also represent the defendant appellant, Mr. Christian, in this matter. This case really presents the prospect that the co-conspirator exception can be applied in such a way that it becomes an exception that swallows the general rule against hearsay in many criminal cases. Here, the statement at issue is one made by Tanisha Edwards to her boyfriend, Mr. Thomas, while Thomas was in jail. It was recorded. And the government argues that she is saying that my client removed incriminating evidence from Thomas' residence. In that recording, she also says he did it, he already did it. And is our position that this alleged conspiracy, if it's not of the type that is contemplated by Federal Rule of Evidence 801D2E, in keeping with Supreme Court precedent on this matter, such as Grunewald and Krulowitz, even if it is, there's no way, and the district court did not find, that this statement was made during an in furtherance of any conspiracy. So the only theory of a conspiracy that we had before the trial court was one to remove incriminating evidence. Obstruction of justice or a crime like that is what the prosecution argued. And so... Isn't it essential to an obstruction of justice that the people who are conspiring know how successful others have been, so they know how far to go when they're interrogated? Well, Your Honor, that... I want to hear your thorough answer, but at the outset, that's a yes or no question. Yes, Your Honor. There are many goals that will be essential to almost any conspiracy that could extend the life of this conspiracy. I'm not talking about extending the life of the conspiracy. You've said that these are two different conspiracies. We're not talking about the conspiracy to do drugs. We're talking about the conspiracy to cover up those crimes. And my question is, why isn't it integral to a conspiracy to cover up a crime? Maybe she was not part of the crime at all, but she could still be part of the cover-up of the crime, right? That's conceptually possible, right? If she was trying to cover up the crime and there was a conspiracy to cover up the crime, I'm having trouble seeing why one person conveying to another how successful they've been isn't integral to covering it up. If they hadn't been successful, he might say something different when interrogated, right? That's right, Your Honor. So it's integral to it, right? Integral to the cover-up conspiracy. Not necessarily, Your Honor. That's my question. Why isn't it integral? The seminal cases on this that I've mentioned. Logically, why is it not? They speak of the central aim of the conspiracy or the primary criminal purpose as what establishes its scope. And the scope necessarily informs the duration and whether or not an act can be in furtherance of an ongoing conspiracy. And so here, although it wasn't argued before the trial court and the trial court didn't find that that was inherent and satisfied the co-conspirator requirements here, simply informing Mr. Thomas of the fact that evidence had been removed is not in and of itself conspiratorial. There are statutes that make it. I'm just not saying why not. We got this where they're not going to find it. That helps the person that you're telling know what to say when he's interrogated. Right, and it informs the listener of the speaker's past criminal acts. Well, that's why they want to get it in, sure. That's why they want to get it in. But the rationale for letting it in is that it's part of a conspiracy. It contributes to the conspiracy to cover it up. I'm just asking why doesn't it? Because, Your Honor, the statement was made after the primary central purpose of the conspiracy had been accomplished, and that was the removing of the drugs. So communicating this to Mr. Thomas to perhaps, as they now argue in their brief, to keep him from cooperating with police, there's nothing inherently criminal about that. It comes after a criminal act of removing and incriminating evidence, which we do not concede. But even if that's the case, there's nothing about that that's criminal. There are statutes that make it criminal to use threats, use of force, bribes to keep a witness from. Let's assume that you're successful on that argument, but that your co-counsel is not successful on his argument. Wouldn't this be harmless error? Certainly, Your Honor. Two points on this, and a first point to page 13 of the government's brief, where they say, quote, The statement was relevant to prove Christian had possessed the firearm found buried in his mother's yard for purposes of count two. That's really what I want to communicate to this court today, is that this is not your typical harmless error analysis here. You don't just look at the statement, because there's also other evidence that was proper protected, the gun found in my client's mother's backyard, that would not have been admissible otherwise. The trial court required the prosecution to find some other way of getting it in, and this was the only other way besides referring to that proffer. And so looking at those pieces of evidence, first point out the sheer frequency with which they were mentioned, including four times by the prosecution in its closing argument, and again on rebuttal closing, arguing that because this gun was found in the backyard, you can find it more likely that the other guns were also possessed by my client. For those reasons, we would ask that this court find that this was not harmless error and grant a new trial. Thank you. Thank you, Mr. Mitchell. Good morning. My name is Timothy Verhey, and I represent the United States on appeal. I was also the trial counsel below. If I can go in reverse order and talk about the co-conspirator issue and whether it's harmless error, even if we get to that point, I would just draw the court's attention to the fact that while the taped statement was helpful and relevant to link the defendant to Ruben Thomas for purposes of the drug distribution charge in count one, and it was helpful and relevant to connect the defendant to the gun found buried in his mother's yard for purposes of, I believe it was count three, we would maintain that if the statement was permitted in error at all, it's harmless error because I think it's important to remember that what the police found inside 618 Granville was a large quantity of heroin up in the basement rafters of Christian's home, and next to it were two other firearms, a Ruger and I think it was a Smith & Wesson, and one of those guns had the defendant's DNA on it. So the three guns were all lumped together in the single gun charge, the 924C and the felon in possession charge. So the taped statement only really goes to the third gun that was found in the defendant's mother's yard. So I think in that sense it's harmless error because it doesn't have anything to do with the other two guns, and it really doesn't add that much to the distribution charge given the quantity of heroin found in Christian's house and the multitude of text messages found on his cell phone where he was. That all goes to harmless error. Correct, right. So as to the rest of the 801D2E issue, we think that it was squarely within the rule because in our trial brief we told Judge Jonker what the Enright Standard was. We were all well aware of that at the district court stage. I think the reason that the transcript focuses more on the link between Christian and the conversation between Tanisha Edwards and Reuben Thomas is because that was what the defense attorney was fighting about at the district court stage. There's no connection between Christian and that conversation. I think we all assumed, and the record will support this, that everybody understood that the statement plainly indicated that the three people were working together. The three people referred to as Boo, is that right? Right. They were arguing about whether Boo meant Christian, is that what they were arguing about? Well, they were arguing about whether Christian was linked enough into the conspiracy besides that statement. Isn't there an argument that the judge below didn't make the third Enright finding? Well, when I read the transcript, it's true that there's not an explicit finding about that, but that's why I'm bringing it up now. I think that part of the test was conceded pretty much before the district court because they were more focused on, well, Christian isn't a member of this conspiracy. There's not enough to link him to it. They weren't really fighting about the third issue. Well, does that relieve him of the obligation to make the determination? Well, no, but I think if you read the whole record in context, you see the judge talking about it at the final pretrial and at the beginning of the trial, after reading the trial brief and referring to the trial brief where all the issues are there, and then the record certainly supports the finding that all the elements were there. Did he go through one by one? But your contention was, quote, that the conspiracy was to remove incriminating evidence from Thomas' home so that Thomas could avoid further legal problems, right? Wasn't that the government's theory? Yes. Well, and that was already accomplished at the time of the phone call, so why does the hearsay exception apply here? Judge Yonker asked us that same question, and that's why you see us telling him. It's because the reason Christian is going to stick his neck out and do this is he wants Reuben Thomas to know that he has done this so that Reuben Thomas won't roll over on him because he's in jail already. They're making a bunch of inferences on that. Well, I think it's a fair inference for a conspiracy, and you're always doing that with conspiracy law, drawing fair inferences. The whole point of helping Reuben Thomas is to keep Thomas from talking to the police about Christian because he's caught, and Christian's still, as far as he knows, in business because he hasn't been arrested yet. This is during that six-hour period after Thomas got arrested but before the police hit the house. I think I understand you. Let's talk about the fundamental problem, about the validity of the search warrant. Sure. From my point of view, this is not a problem because we're starting with the fundamental fact that the police did what we want them to do, which is go get a search warrant before doing a search. Sergeant Bush put down the facts as he knew them in his affidavit. He went to a neutral and detached magistrate in Michigan's second biggest city, went before a magistrate whose job it is to review search warrants all day, every day, and that magistrate approved the warrant. That's a valid search unless my opponents can overcome the presumption that it's a valid search. To do that, as we all know, we have to give great deference to that decision and we have to not read into the affidavit hyper-technical terms. Nor can we read into the affidavit an assumption that they have recited the accurate facts that are necessary to underlie and grant a warrant. That's true. The facts have got to be there. That's correct. That's the whole issue. I'm perplexed by this argument, the wording of this warrant that says the officers saw Reuben Thomas walk away from the area of the house and leave the area in a vehicle. Then later on it says Reuben Thomas denied that he was at that address and that contrary to observations of the law enforcement officers. I don't think you get to avoid the issue and expect the court to assume something. I don't understand. It doesn't say we saw Reuben Thomas at this address. It says we saw him in the area. How then can we be expected to presume that by saying he left, he denied being at that address, but that's contrary to observations of the law enforcement officers when they have immediately before that said all we saw him in was the area of the home. I do have to agree that if Sgt. Bush were a law clerk or a judge or one of us lawyers, he probably should have used more careful words. I would just think if he was a human being expressing what he had seen, it would not be conditional language. Either he saw him at the address or he didn't. He didn't see him. Police officers, they get that stuff all the time. Either I saw you there or I didn't see you there. That's not what this affidavit doesn't say. I saw you there. If you read the rest of the record, I think it becomes clear. Yeah, but we're at the four corners of the affidavit. That's all you've got. Bush certainly doesn't say this in his affidavit. He doesn't say I was watching. We know from the rest of the record it was ATF agent Holt and other people watching. He's off getting his affidavit. As Judge Yonker pointed out, one reasonable construction of the wording is he was trying to be careful because he wasn't there. He didn't want to say that anybody saw Thomas go into the house, even though we know that he did. The question is not whether he went in or not. That's about buying drugs. The question is whether they can even place him at that location. Give me your best shot for why you think this places him at that location because I'm not seeing it. Okay, I'll be happy to. Fact number one is officers watching 618 Granville report seeing Thomas. In the area. In the area, but they're watching 618 Granville, not the city of Grand Rapids, not the street, that house. Then he's followed. He's stopped and he's found with 20 grams of heroin. It's reported that it's in chunk form and it's consistent with being taken off a bigger block of heroin. Then, as we all know, the officers ask Thomas, where were you? Were you on Granville Avenue? He says, well, I was on Granville Avenue, but I wasn't on 618, to which Bush says that's contrary to what the officers saw. So you've got to give it some meaning, and so I think it's a reasonable interpretation for the magistrate. It's not contrary to what the officers saw. It just says contrary to the officers' observations, right? Let me make sure I get the wording right here. Contrary to observations of the law enforcement officers. Right, that's at page ID 150. You think if they're surveilling the house, their eyeballs are looking at 618 Granville, they would know, hey, they saw Thomas walk in or out of 618 or they didn't, and they don't say that in the affidavit. They've certainly got to know the importance of trailing who's going in and out of the house they're observing because they think it's a drug house. Well, Bush wants to make sure that he's not saying something that's false, and since he wasn't there, he doesn't want to say that he was in the house. What he wanted to say was. . . If the ATF agent said I saw Thomas walk out of that house, I'm sure Bush would have said he was observing. Well, I don't want to. . . Even I don't want to make that. . . Let me ask you this. Why, you know, if you've got to have corroboration, which typically, why wouldn't they have used the same person who did the controlled by eight months before do another controlled by the day before? Well, there's a lot of reasons for that. That person might be in jail on a different offense. It might be out of town. Why wouldn't they observe the house for two or three days and chalk up how many people are coming in and out and in and out, and then when they have it, get you cold? I mean, this is just sort of sloppy police work here. Well, I want to take a page from the White decision where a panel of this court said, it's not about what should have been done or isn't in the affidavit. What we need to focus on is what is in the affidavit. Well, I understand that case. So, yeah, there could be a perfect surveillance and a perfect . . . Well, tell me this. Are you familiar with the case of United States v. Hython, H-Y-T-H-O-N, the Sixth Circuit case from 2006? Yes. It seems strikingly similar. I mean, I want you to distinguish it because there was a controlled by at some point where it was stale. I don't think the case says eight months. And what the court says is, and this was going to the Leon good faith saying it was not, and it says, quote, because the affidavit included no observation of deliveries to the address, no monitoring of the frequency or volume of visitors to the house, no second controlled by, and no further surveillance whatsoever, they held that no reasonable officer could have believed the affidavit established probable cause to search the residence. Now, how do you distinguish that from our situation? I don't think I can do it standing here because I would like to read the facts, and I'd be glad to submit a supplemental. One way is that if in that case there was no surveillance whatsoever, here there was clearly surveillance. I'm familiar with the case title, but I didn't read the facts of it carefully before coming in here. I'm sure you're familiar with the basic law. Yes. If the by that you have as your key evidence, the controlled by, is stale, and this one's eight months old, I don't think anybody's going to say it's not stale, you have to, as a police force, provide confirming information that would enable you to bring that staleness to fruition on the date of the warrant. That's Brown. That's Hython. There's all kinds of case law on that, and these cases even talk about the fact that you need to have evidence from that surveillance, other police corroborative evidence, and in most of those cases it's a bunch of bys at the house. The police say, okay, I know I've got an old by, and I'm getting ready to get a warrant because I want to go inside that house. Now I've got to confirm it, and the way they confirm it is by surveillance for several days or weeks. They say who's coming. This is a drug den. We see all these people coming and going. We've sent people in, and there are controlled bys there. What you have is one day seeing somebody in the area, no warrant application that says we saw another by that day. How is that corroborative? How does that bring the staleness forward? I respectfully disagree because we also have a statement in the affidavit about four months' worth of multiple people saying they're buying large amounts of drugs from that house, and they corroborate each other. Multiple people saying the same thing, corroboration. What information do you have in this affidavit about those multiple people? You have named somebody out there as telling us this. In that group, there's not even an allegation that they are known, recognized, experienced informants. All it is is four people have told us, four individuals, unspecified, have given us the information that there are lots of drug buys going on at that house. Isn't that the kind of generic thing that anybody could say without rising to the level that the law expects of either some specificity or corroboration of the viability of the people you're relying on? I think I'll just repeat what the law tells us, which you have to take everything in the affidavit together, not pick out one or two things and attack that. All of it together, to my mind, and also in the mind of the issuing magistrate, rises to the level of probable cause. What's your best case for your position, would you say, as the closest to this that justifies the search? U.S. v. White, which you all decided in October, which I know Judge Gilman and Judge Stranch, who were on that panel, I'd be committing malpractice if I didn't point out that this is. . . But what you all talk about at length is what's the difference between a bare bones affidavit that no reasonable officer can rely on and what's an insufficient affidavit that just doesn't have enough probable cause. A key thing that you all point out is if there's any connection to that address, no matter how stale or remote, then . . . and that's on page . . . Yeah, but there there was an immediate connection just before the search. There was a drug buy right in the guy's driveway. But I'm saying we have all kinds of connections between 618 Granville and drug trafficking. We might disagree about how old they are. That's the difference, because you've got to show a fair probability that there will be drugs found today on the day of the search. Not for the good faith exception, according to White on page 497. For good faith, and remember you've got multiple officers here doing the search, not just the affidavit, including ATF agent Drew . . . I forget his last name now . . . who watched Reuben Thomas go in and out of that house three times. So he's the surveilling officer. Wait, wait, where in the affidavit does it talk about Thomas going in? No, I'm talking about good faith for the officers doing the search. So that's one point that the court makes in White is, you've got to look at the good faith of the officers doing the search. And one thing that we've got to factor in for good faith is, you've got officers that have seen all this stuff unfold in front of them. How can they possibly have bad faith, not knowing what's in the affidavit necessarily, but knowing what they knew? And so you've got that, and you've got clear links between 618 Granville over a number of years and drug trafficking. Let me ask you one final question I've got. Let's assume that the affidavit is enough for there to be reasonable suspicion that there are drugs in this house. If that's so, reasonable suspicion is not enough to be probable cause, is it? I would agree with that. There's a different standard. I mean, the reasonable suspicion is like a Terry stop kind of Fourth Amendment issue, and that wouldn't be it. It takes more than that. We've got cases that say probable cause is more than reasonable suspicion. Oh, yes. It's a higher standard than reasonable suspicion, but it's not proof beyond a reasonable doubt either. It's not a difficult. You've got to decide where in this whole spectrum of things this case falls. Correct. I see I've gone past my time. I don't mean to take up the court's time. If there's any more questions, I'll be glad to answer them. We'll do a rebuttal now. Your Honors, two points on rebuttal. We are not first on the Fourth Amendment issue, and we are not dealing with one of the exceptions to Leon good faith here that permits looking to facts that are outside the four corners of the affidavit if those facts were not brought before the magistrate, and there's no evidence that they were. So when we're left with this affidavit, we do not see that the affidavit establishes for the magistrate the facts that allow him to find probable cause. There's so much that's missing there, and there's also no reasonable officer could rely on this affidavit because it does not establish, except for old and unreliable information, there's nothing that says that there's going to be drug dealing in the place that's searched at the time of the search. I'd also like to turn back to the hearsay issue here. What if someone was like across the street from a place that over the years has been a drug house and then drives off and then later is found without having stopped anywhere else with 20, whatever it is, substantial amounts of drugs? A reasonable person hearing that would have no basis for saying it's likely or probable or that drugs were taken from that house? Nothing at all? No, Your Honor. As far as our research is concerned. I just don't think people think that way. I think people reason with probabilities. You say the area, the area to me, you could say the area means the whole neighborhood or you could say the area means the front yard. And I could understand it either way. I mean, in normal English, couldn't you? He came from the area of that house. If the context is drugs and so forth saying from the area, people assume that it's not from the whole neighborhood, but it's from someplace close. Now maybe if the person making the affidavit didn't identify that they walked out of the front door because maybe they didn't see him walking out of the front door. Maybe they were out on the front lawn or in the driveway or in the street in front of the house. You would, in normal parlance, say the area of the house, wouldn't you? Your Honor. You wouldn't. You would never say, oh, I saw him in the area, Dick's house or Joe's house, if he was walking down the street in front of it. No, Your Honor. This Court's decisions are very clear that the officer has to, or the defiant, has to establish a nexus to the house. I'm saying there's a nexus when you're departing from an area that's close to the house. Why isn't that a nexus? In ordinary understanding, especially when you have a whole lot of other stuff which sort of leans that way, but by itself wouldn't be enough. I'm just having trouble seeing why that wouldn't be a connection. This Court has never, that would have to be an extension of any holding that this Court has ever made, and we would ask that that not be made here because of the implications for anyone living in a high-crime neighborhood, the fact that their home could be searched. Where did the high-crime neighborhood come from? Speaking of the policy behind deterrence... That's not somebody near somebody's house. In a beautiful suburban house, you could say he's in that area, in the area of a house. If you'd say in the area of a street or in the area of a neighborhood, but if you say in the area of the house, isn't common parlance like the area around the house? Speaking of the high-crime neighborhood, because the implications there are all the stronger... If we accept some kind of reasonable rationale like that, we'd have to accept some unreasonable rationale about a whole neighborhood, but I'm suggesting that it doesn't imply that at all. It just applies the area around the house. For the officer, if the officer saw Mr. Thomas go in and leave the house, that would have been very easy to put in the affidavit. If they'd seen him with drugs in his pocket, they would have had a better case too, but we have to look at the case we have. We would ask that this Court not find that that is enough to establish the minimally sufficient nexus required for the search of this home. That makes sense. Thank you. We appreciate your argument, and good luck. You all did great. We appreciate everybody's argument. The case will be submitted.